IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| SHARON A. HOWELL, | ) | Case No. 3:25-cv-01206-JRK |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.  Introduction

Plaintiff, Sharon Howell ("Howell"), seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Howell's application for DIB be affirmed.

## II.  Procedural History

Howell filed for DIB on November 14, 2017, alleging a disability onset date of March 7, 2016. (Tr. 211). The claims were denied initially and on reconsideration. (Tr. 72-89, 91-107). She then requested a hearing before an ALJ. (Tr. 128). Howell (represented by counsel) and a vocational expert ("VE") testified before ALJ Vitello on March 5, 2020. (Tr. 2333-64). On April

9, 2020, ALJ Vitello issued a written decision finding Howell not disabled. (Tr. 2275-95). The Appeals Council denied her request for review of that decision on March 10, 2021. (Tr. 2303). Howell appealed to the United States District Court, and, after a stipulated remand, the case was remanded to the Commissioner for further proceedings pursuant to Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). (Tr. 2314).

A second hearing was held before ALJ Vitello on November 14, 2022. (Tr. 2230-74). On March 7, 2023, ALJ Vitello issued a second unfavorable decision, finding Howell not disabled. (Tr. 2205-29). Howell appealed to the United States District Court, and again, after a stipulated remand, the case was remanded to the Commissioner for further proceedings under Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). (Tr. 3859).

The Appeals Council then remanded to a new ALJ to articulate the persuasiveness of all medical opinions and prior administrative medical findings in the case record, and to consider whether Howell's impairments or combination of impairments meet or medically equal a listing, including consideration of Rulings 12-2p, 14-2p, and 19-4p for diabetes, history of chronic migraine, and fibromyalgia. (Tr. 3862-63). In addition, the ALJ was instructed to give further consideration to Howell's maximum residual functional capacity ("RFC"), and, if appropriate, gather additional evidence from Howell's medical sources and a VE. (Tr. 3863). ALJ Ashford then held a hearing on March 18, 2025, with testimony from a Medical Expert ("ME") and a VE. (Tr. 3816-33). On April 7, 2025, ALJ Ashford issued an unfavorable decision, again finding Howell not disabled. (Tr. 3771-3815). The Appeals Council did not assume jurisdiction, making ALJ Ashford's April 7, 2025 hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.984(d)). Howell timely filed this action on June 9, 2025. (ECF Doc. 1).

**III.     Evidence**

**A.     Personal, Educational, and Vocational Evidence**

Howell was 50 years old on the date last insured, making her a younger individual according to Agency regulations, and later changed age category to closely approaching advanced age during the relevant period. (*See* Tr. 3802). She graduated from high school. (*See id*). She had no past relevant work at the time of the ALJ's decision. (*Id.*).

**B.     Relevant Medical Evidence**

On November 15, 2016, Howell treated with Jianming Han, M.D., for follow up after a mammogram. (Tr. 435-40). Howell reported moderate chronic bilateral shoulder and lower back pain for the last ten years, with a fibromyalgia diagnosis; she also reported tension type headaches, worsened by stress, occurring the last five years. (Tr. 435). On examination, Howell had mild tenderness in her temples, as well as tenderness in her cervical, thoracic, and lumbar spine, and over the bilateral thighs, back, and shoulder area. (Tr. 438). Dr. Han referred Howell to rheumatology for evaluation of her elevated c-reactive protein and fibromyalgia. (Tr. 439). Dr. Han also started Howell on amitriptyline 25 mg at bedtime for fibromyalgia and headache. (*Id.*). Howell was also taking a statin, Diflucan, duloxetine 30 mg, vitamin D2, Inderal LA 60 mg, Synthroid 125 mcg, and Zantac. (Tr. 439-40).

On January 9, 2017, Howell followed up with Dr. Han. (Tr. 472-77). Dr. Han noted that Howell had an uncontrolled elevated sedimentation rate and no improvement in her myalgia despite taking prednisone as directed. (Tr. 472). Dr. Han renewed the rheumatology referral order, because the prior referral did not take Howell's insurance. (Tr. 476-77).

On January 16, 2017, through a referral from Dr. Han, Howell began treatment with Eisha Mubashir, M.D. at the Arthritis and Rheumatism Center. (Tr. 848-67). Dr. Mubashir noted

3

a medical history significant for depression, migraines, hypothyroidism, fibromyalgia, and hyperlipidemia. (Tr. 854). Howell reported that a recent x-ray of her lower spine, taken after a fall, revealed degenerative disc disease. (Tr. 853, 886). She also reported having four headaches per month, depressed mood, myalgias in her arms and legs and weakness in her hands and feet. (*Id.*). Prior trials of prednisone, Toradol, and Vicodin did not relieve her symptoms. (Tr. 853). She reported moderate to severe pain of 8-10/10 most days. (*Id.*). On examination, Howell had 5/5 strength; normal range of motion; and no synovitis or tenderness in all palpated joints. (Tr. 854). Howell had multiple tender points on the right and left side of her body, above and below the waist, and significant tenderness in the trapezius area bilaterally and paralumbar spine area. (*Id.*). Labs from November and December 2016 revealed normal CBC, CMP, and TSH levels, and were negative for rheumatoid factor and anti-CCP antibody tests. (Tr. 854). Dr. Mubashir prescribed Mobic 15 mg daily and increased Cymbalta to 60 mg daily. (*Id.*). In addition, Dr. Mubashir ordered baseline labs; x-rays of lumbar and cervical spine, hips, and sacroiliac joints to look for inflammatory or degenerative changes; and recommended follow up in two to three weeks to review results and make further recommendations. (*Id.*).

On March 8, 2017, Howell presented for a physical therapy evaluation with Kirsten M. Seger, PT. (Tr. 478). Howell reported a 2006 fibromyalgia diagnosis, and presented with pain in her cervical and lumbar spine, extending down her lower extremities; she had stopped working on March 6, 2016. (Tr. 478, 482). On examination, Howell had an antalgic gait; reduced range of motion, muscle tension, and soft tissue restrictions in her bilateral upper trapezius on palpation; reduced bilateral hip abduction strength; pain in her cervical spine; mild restriction with rotation in her bilateral lumbar spine; and right knee crepitus. (Tr. 482-85). Howell was unable to tolerate PT Seger's light manual myofascial release techniques for longer than four minutes due to pain.

(Tr. 485). PT Seger recommended land-based and aquatic therapy sessions once each per week. (*Id.*). Howell began aquatic therapy on March 10, 2017 with Scott S. Garman, PT. (Tr. 499-501). She presented with generalized muscle weakness, difficulty walking, and reported 7/10 pain "all over" her body. (Tr. 499). Howell continued in physical therapy throughout March 2017. (Tr. 501-31).

On August 15, 2017, Dr. Han diagnosed Howell with moderately severe neuromuscular disease, noting general fatigue, dyspnea on exertion, shortness of breath, and she was not responding to steroid therapy. (Tr. 765). Polymyalgia rheumatica ("PMR") and cardiac causes were ruled out. (*Id.*). Physical examination results were largely normal, with decreased gripping of bilateral hand and extension of fingers. (Tr. 769). Dr. Han referred Howell to a neuromuscular disorder specialist. (Tr. 770).

On September 8, 2017, Howell met with Dr. Mubashir complaining of migraines four to five days per week and requested a referral to neurology for better migraine management. (Tr. 966). Dr. Mubashir also noted that on March 22, 2017, Howell had few tender points in bilateral upper arms and in the cervical and paraspinal areas. (*Id.*). He continued her on Neruontin 300 mg twice daily, Cymbalta 60 mg, Zanaflex 2-4 mg as needed, and Mobic 15 mg. (*Id.*). He referred Howell to the headache and fibromyalgia clinics. (*Id.*).

On September 15, 2017, Howell presented to Paul Pritikanta at the at the University of Toledo's rural health center ("RHC") neurology clinic for evaluation of neuromuscular weakness, including complaints of unsteady gait, fatigue, and infrequent falls attributed to pain, ankle swelling, and generalized weakness; but no other neurological symptoms. (Tr. 925-30). Howell reported a 2006 fibromyalgia diagnosis with elevated erythrocyte sedimentation rate ("ESR"), initially treated with continuous prednisone, later switched to Cymbalta, Mobic, and

Neurontin. (Tr. 927). Neurological examination revealed mild weakness in the bilateral elbow, but no easy fatigability and no weakness of neck extensor/flexor. (Tr. 928-29). Prior cardiac and pulmonary evaluations had revealed borderline left ventricular hypertrophy and moderately severe neuromuscular disease. (Tr. 929). Howell was recommended to obtain blood work for myopathy and myasthenia, as well as EMG/NCV including repetitive nerve stimulation testing, with follow up in three months. (*Id.*).

On September 21, 2017, Howell began treating with Kim Binkley CNP for primary care. (Tr. 787-803).

On October 24, 2017, Howell presented to Jocelyn Wray, M.D., for moderate and worsening weakness, affecting lifting and walking; with associated symptoms including incontinence, dyspnea, falling, headache, and numbness. (Tr. 828-32; 870-72; 879-80). Howell reported dull neck pain, tripping often, and pain in her shoulders. (Tr. 831; 879-80). Howell submitted to motor nerve conduction, sensory nerve conduction, EMG, and responsive nerve stimulation studies. (Tr. 870-71). Results were abnormal; Dr. Wray concluded that carpal tunnel syndrome could explain a portion of Howell's symptoms but not the entirety, and there was evidence of axomal degeneration and bilateral Martin-Gruber connection. (Tr. 872). However, there was no electrodiagnostic evidence of other upper extremity focal neuropathy, radiculopathy, plexopathy, or myopathy, and needle EMG did not show fasciculation potentials. (*Id.*).

On January 26, 2018, Howell returned to Paul Pritikanta at the RHC neurology clinic with complaints of ongoing weakness and fatigue, along with exertional dyspnea after a pulmonary function test suggested neuromuscular weakness. (Tr. 920-25). Howell also reported migraines four times per week, treated prophylactically with propranolol and magnesium. (Tr.

924). On examination, Howell's bilateral shoulder strength was noted as 4+/5, effort dependent; she had reduced reflexes bilaterally; but otherwise largely normal examination results. (*Id.*). Howell was started on Topiramate 25 mg daily, titrated up to 50 mg twice daily for headaches; slowly tapered off Inderal over the next two weeks; was referred to psychiatry for complaints of low mood and depression; recommended to use a wrist splint for bilateral carpal tunnel syndrome; and recommended to follow up in three months. (*Id.*).

Howell returned to Dr. Mubashir on January 22, 2018, with continued complaints of stiffness and pain in her neck, shoulders, and lower back. (Tr. 964). Dr. Mubashir continued her on Cymbalta 60 mg, gabapentin 300 mg twice daily, Mobic 15 mg daily, tizanidine 2 mg; increased Pamelor to 25 mg daily, with recommendation to follow up with her PCP and neurologist for her other issues. (*Id.*).

On April 2, 2018, Howell presented to the emergency department after a migraine had worsened over multiple days. (Tr. 985-96). She reported taking Topamax and Mobic as prescribed, as well as Tylenol as needed. (Tr. 986). CT scan of her head was normal. (Tr. 994). She was diagnosed with an upper respiratory infection and migraine, provided with Ketorolac and Toradol injections and released to follow up with her PCP and neurologist. (Tr. 994-95).

Howell followed up with CNP Binkley on April 4, 2018, for her migraine. (Tr. 1062). She reported that she had the migraine for the past five days and reported blurred vision, dizziness, blackouts, nausea, and photophobia. (*Id.*). CNP Binkley noted that Howell had increased anxiety, which may have caused the headache. (Tr. 1068). CNP Binkley provided Toradol and Phenergan to abort the headache, and Zofran as needed for nausea. (*Id.*).

Howell returned to CNP Binkley on April 30, 2018, complaining of the same migraine lasting three weeks. (Tr. 1075). She described the headache as a band around the top of her head,

tingling to the top of her head, radiating down the right side of her face. (*Id.*). Howell also reported blurred vision, dizziness, nausea, phonophobia, and photophobia, and that an MRI conducted by neurology was normal. (*Id.*). Howell reported that Imitrex was helpful and that the headache would get better with medicine but then get worse again. (*Id.*). CNP Binkley provided Toradol 60 mg and Phenergan 25 mg injections and recommended Howell follow up with neurology. (Tr. 1083).

On May 4, 2018, Howell followed up with CNP Binkley, reporting that her headache was still present, but improving; she also presented with a depressed mood and reported difficulty concentrating, falling asleep, fatigue, diminished interest or pleasure, and feelings of guilt. (Tr. 1089). CNP Binkley assessed Howell as having a moderate episode of major depressive disorder and other headache syndrome. (Tr. 1097). She prescribed Howell with Abilify 5 mg and continued her other medications. (Tr. 1098).

On July 17, 2018, Howell presented to CNP Binkley complaining of leg swelling for the last two weeks, with pain in her calf, left worse than right. (Tr. 1109). Howell reported having a right sided headache that started frontal and extended to the back of her head, with nausea, photophobia, and phonophobia. (*Id.*). Howell reported she was following with a neurologist for her headaches, and that she was following with psychiatry and seeing a counselor weekly for her depression and anxiety. (*Id.*). On examination, Howell was positive for bilateral leg swelling, positive for weakness, numbness, and headaches with a mild headache from the right side of head extending back to the occiput, and had tenderness in her Achilles with flexion. (Tr. 1109-11). Examination results were otherwise unremarkable. (*Id.*). CNP Binkley assessed Howell with hypothyroidism, major depression, leg swelling, and costochondritis. (Tr. 1112). She recommended a bilateral ultrasound of Howell's legs to check for deep vein thrombosis,

provided one refill of Imitrex, and recommended Howell follow up with neurology and her psychiatrist. (*Id.*).

On October 18, 2018, Howell followed up with CNP Binkley. (Tr. 1776-80). Howell reported that her rheumatologist discontinued care, because he felt there was no more he could offer her for her chronic pain. (Tr. 1779). Howell was taken off gabapentin because she was too sleepy and pain had worsened in her legs, shoulder, and back; she was taking Tylenol for pain. (*Id.*). She reported Zanaflex was helpful, but she continued to have pain, worsened with walking. (*Id.*). CNP Binkley also indicated hypothyroidism caused Howell to feel tired all the time. (*Id.*). On examination, Howell was positive for fatigue, headaches, leg swelling, back pain, joint swelling, and myalgias. (*Id.*). Examination also revealed Howell had diffuse tenderness at all tender points for fibromyalgia. (Tr. 1780). CNP Binkley increased the Zanaflex to 2 mg, three times daily, and could go up to 4 mg; if that causes sedation, she may try Baclofen; she also recommended rechecking TSH and T4, and obtaining bloodwork. (*Id.*). CNP Binkley provided Howell with a handicap placard and recommended follow up in three weeks. (*Id.*).

On January 29, 2019, Howell followed up with CNP Binkley with complaints of pain. (Tr. 1767). Howell reported her pain was constant, aching all over, and was worse with weather changes. (*Id.*). On examination, she had normal range of motion and strength, but had edema in both legs and was positive for headaches, arthralgias, and myalgias. (Tr. 1767-68). CNP Binkley restarted Howell on Mobic, increased Zanaflex to four times daily as needed for fibromyalgia pain, and refilled Imitrex for headaches until Howell could meet with neurology. (Tr. 1769).

May 22, 2019 notes from Howell's left salpingoopherectomy found increased fatigue, improved abdominal pain, and diffuse generalized muscle pain with palpation. (Tr. 1751, 1758). She was recommended to recheck TSH and T4 in four weeks, and continue with back stretches,

9

alternating ice and heat, and may need referral for pain management for her right sided low back pain with sciatica. (Tr. 1752).

On August 8, 2019, Howell followed with CNP Binkley, who noted that Howell had been discontinued from psychiatric care with her provider in Toledo due to a no-show. (Tr. 1752). Howell reported worsening mood, and feelings of worthlessness and like she is a burden to others. She was tearful; she had suicidal thoughts occasionally but was not suicidal during the visit. (*Id.*). Howell continued to follow with her local counselor weekly. (*Id.*). Howell complained of back pain, primarily in her right side and frequent emergency department visits. (*Id.*). On examination, Howell was positive for leg swelling and abdominal pain, and her salpingoopherectomy incisions were healed. (*Id.*). She was positive for arthralgias, low back pain down the back of right leg, and myalgias. (*Id.*). She had normal range of motion but had edema, pain with palpation to right lower paraspinous muscles and right gluteal, as well as generalized, diffuse muscle pain with palpation. (Tr. 1744). CNP Binkley recommended Howell follow with a new psychiatrist and that she continue with counseling. (*Id.*). She also increased Howell's Abilify to 10 mg daily, added Vistaril for sleep and increased stress/anxiety, decreased Cymbalta to 30 mg daily, and started 5 mg Lexapro at bedtime. (*Id.*).

On August 14, 2019, Howell followed up with CNP Binkley for treatment of her major depressive episode. (Tr. 1735-39). CNP Binkley noted that her PHQ 9 and anxiety scores improved, and that Howell had no suicidal or self-harm thoughts. (Tr. 1738). She increased Lexapro to 10 mg at bedtime, decreased Cymbalta to 30 mg with instructions to discontinue after 10 days, and provided Howell a list of psychiatrists who might take her insurance. (Tr. 1738-39).

On August 19, 2019, Howell started physical therapy for her chronic low back pain and sciatica. (Tr. 1909). Diagnosis notes indicated chronic low back pain laterality with sciatica,

generalized muscle weakness, fibromyalgia, and difficulty walking. (*Id.*). Howell reported going to the emergency department several times for "grabbing pain" and that as her pain increases, her depression worsens. (*Id.*). On examination, Howell was moderately tender to palpation, had an abnormal gait pattern, impaired balance, impaired coordination, abnormal posture, deconditioning, muscle weakness, impaired range of motion, impaired neuromuscular control, and had pain with movement and pain in any position if in it for too long. (Tr. 1910-12). She was recommended to attend physical therapy twice weekly for five weeks. (Tr. 1912). On October 1, 2019, Howell had attended the recommended sessions and was discharged, reporting that overall, the physical therapy had been beneficial. (Tr. 1848-1908).

On August 28, 2019, Howell followed with CNP Binkley for follow up of her depression, chronic migraine, and GERD. (Tr. 1728-34). CNP Binkley noted that Howell had no new or unusual musculoskeletal symptoms and no unusual headaches; her physical examination was unremarkable. (Tr. 1733). CNP Binkley provided a referral to psychiatry, increased Lexapro and nortriptyline to 20 mg daily, ordered labs, and recommended to continue with physical therapy for low back pain. (Tr. 1734).

On November 22, 2019, Howell followed up with CNP Binkley for care of her chronic medical issues, including depression, GERD, hypothyroid, chronic low back pain, and fibromyalgia. (Tr. 2051-52). On examination, Howell exhibited mild left ankle pain and mild ankle and pedal edema. (Tr. 2052). CNP Binkley noted Howell was compliant with her medications, including Abilify and Lexapro for depression; pantoprazole, Carafate, and Zantac for GERD; and baclofen for her low back and chronic muscle pain. (*Id.*). CNP Binkley stopped Zantac and started Pepcid 40 mg at bedtime, recommended running socks or compression hose

11

of 20-30 mmgg and an Ace wrap to her left ankle; and recommended obtaining blood work and following up in three months. (Tr. 2053).

On December 10, 2019, Howell followed up with CNP Binkley for high blood sugar and a new diabetes diagnosis. (Tr. 2034-37). Howell reported that her fibromyalgia was flaring and complained of blurred vision, headache, dry mouth, and fatigue. (Tr. 2034). On examination, Howell had lower leg edema but results were otherwise unremarkable. (Tr. 2037-38). CNP Binkley provided Howell 10 units of Lantus in office, prescribed metformin, and recommended diet and lifestyle changes to manage her diabetes. (Tr. 2039). Howell followed up with CNP Binkley on January 2, 2020, and had overall been doing much better with management of her diabetes. (Tr. 2022). On examination, she was positive for fatigue, but results were otherwise unremarkable. (Tr. 2022-23). CNP Binkley continued Howell on Lantus 20 units at bedtime, glimepiride 2 mg twice daily, and metformin 1000 mg twice daily, and recommended she increase activity to 30 minutes 5 days per week. (Tr. 2023-24).

On February 21, 2020, Howell returned to CNP Binkley for shoulder pain after she fell. (Tr. 2011). Howell reported ongoing bilateral shoulder pain, right worse than left, shooting down to her fingers, and that she was unable to lift very much. (*Id.*). On examination, she had reduced shoulder range of motion, was positive for arthralgias and myalgias, and was anxious. (Tr. 2012). CNP Binkley referred Howell to physical therapy to treat the bilateral shoulder pain, and provided ketorolac 10 mg every 6 hours, Tylenol as needed (no more than 3000 mg daily), discontinued baclofen, and continued Flexeril 10 mg as needed for muscle spasms or pain. (*Id.*).

On March 3, 2020, Howell followed up with CNP Binkley regarding completion of disability paperwork for her underlying medical conditions. (Tr. 3277). On examination, she was positive for fatigue, arthralgias, back pain, myalgias, and dysphoric mood with flat affect and

12

withdrawn behavior. (*Id.*). She was unable to lift her arms above her head, and complained of pain to her bilateral shoulders at 90 degrees. (*Id.*).

On April 27, 2020, Howell followed up with CNP Binkley with continued complaints of right shoulder pain, not improved after physical therapy and compliance with home exercises. (Tr. 3271). On examination, Howell was positive for arthralgias, tenderness, and decreased range of motion of her right shoulder. (*Id.*). CNP Binkley referred Howell to orthopedics, prescribed ketorolac and a muscle relaxer, and recommended icing her shoulder. (Tr. 3272).

On May 15, 2020, Howell treated with CNP Binkley for bilateral leg swelling. (Tr. 3265). She reported that her legs felt tight, she had numbness and tingling, and that she was unable to get her hose on due to chronic pain. (*Id.*). On examination, she was positive for leg swelling, back pain, 2+ edema bilaterally, and generalized swelling. (Tr. 3265-66). The examination was otherwise unremarkable. (*Id.*). CNP Binkley prescribed Lasix 20 mg twice daily for 1 week, and recommended Howell follow up thereafter. (Tr. 3266). At a follow up visit on May 22, 2020, Howell reported she was elevating her leg at home, and that the Lasix helped the swelling in her ankles a little, but her feet were still swollen. (Tr. 3257). On examination, she was again positive for leg swelling, back pain, 2+ edema bilaterally, and generalized swelling, but the examination was otherwise normal. (Tr. 3257-58). CNP Binkley recommended Howell increase her water intake, to wrap her legs and use baby powder to help her compression hose slide on, and prescribed Chlorthalidone 25 mg daily. (Tr. 3258).

At a follow up visit with CNP Binkley on June 22, 2020, she noted Howell often had high blood sugar levels, possibly due to taking her medications at irregular intervals. (Tr. 3251). The zipper compression hose, chlorthalidone, and increased water intake had improved her leg swelling. (*Id.*). On examination, Howell was positive for fatigue and leg swelling, but the

13

examination was otherwise unremarkable. (Tr. 3251-52). CNP Binkley continued Howell on her current treatment plan, with recommendation to return in two months for "full chronic follow up." (Tr. 3253).

On November 2, 2020, Howell followed up with CNP Binkley[1] after going to the hospital for chest pain. (Tr. 3236). She had low potassium and magnesium, and had been placed on potassium 40 meq daily since discharge. (*Id.*). On examination, she was positive for appetite change, leg swelling, nausea, arthralgias, generalized swelling, increased sadness, +1 pitting bilateral lower extremity edema, and headaches. (Tr. 3237-38). Howell reported she "hurt 'all over'" from her fibromyalgia and had a migraine during that visit. (Tr. 3237). CNP Binkley recommended a regular bloodwork schedule, and recommended Howell take Zofran as needed for nausea. (Tr. 3238).

On February 3, 2021, Howell followed with CNP Binkley for review of her chronic symptoms. (Tr. 3219-22). She reported that the Toradol was not helping her fibromyalgia pain, and she had pain in her shoulder, lower back, upper legs, and knees. (Tr. 3221). On examination, CNP Binkley noted that Howell had no new symptoms, i.e., that her fibromyalgia pain was the same and she continued to have +1 edema in her bilateral lower extremities. (Tr. 3222). CNP Binkley started Howell on Etodolac 200 mg twice daily and continued her on Flexeril. (*Id.*).

At follow up on August 12, 2021, CNP Binkley noted that Howell's fibromyalgia was stable on Flexeril and Etodolac 200 mg twice daily. (Tr. 3198). CNP Binkley increased Lantus to 18 units daily in the morning, continued Howell's other medications, and recommended full blood work in three months. (*Id.*).

---

[1] It appears that CNP Binkley changed her name, as the provider's name is listed in these notes as Kim M. Runser, APRN-CNP. For consistency, I continue to use "CNP Binkley" to refer to this provider.

14

On September 22, 2021, Howell attended an appointment with CNP Binkley complaining of significant weight gain, leg swelling, wheezing, chest pain at times, frequent headaches, and pain all over. (Tr. 3181). On examination, Howell was positive for activity change, appetite change, fatigue, shortness of breath, wheezing, chest pain, leg swelling, decreased urine volume, tachycardia, and arthralgias. (Tr. 3184). She had edema in her bilateral legs with 3+ pitting and swelling up to her hips. (Tr. 3185). CNP Binkley noted that recent bloodwork revealed no acute changes, and chest x-ray was within normal limits. (*Id.*). CNP Binkley held etodolac, continued Aldactone 25 mg daily, added Lasix 40 mg daily for 7 days, and recommended Tylenol 650 mg every 8 hours and Voltaren cream 4 times daily for pain. (Tr. 3185-86).

### C.     Medical Opinion Evidence

#### 1.     Kim Binkley, CNP.

On December 15, 2017, CNP Binkley completed a physical activity opinion form, describing a fair prognosis on Howell's fibromyalgia, based on their five-month treating relationship. (Tr. 910-12). In it, CNP Binkley opined that Howell was limited to sitting, standing, and walking for less than 2 hours, and could sit and stand for less than 10 minutes at a time. (*Id.*). CNP Binkley included a handwritten explanation that Howell has increased pain when standing or sitting longer than 10 minutes at a time. (*Id.*). Howell needed to shift positions at will and would need to take unscheduled breaks during an eight-hour workday. (*Id.*). CNP Binkley opined that Howell would need to elevate her legs 3 feet high for 50% of the day. (Tr. 911). She further opined that Howell could lift and carry up to 10 pounds occasionally; and less than 10 pounds frequently, but could never lift more than 20 pounds. (*Id.*). Howell could reach overhead bilaterally 50% of the workday. (*Id.*). CNP Binkley opined that Howell should avoid exposure to all environmental hazards except for extreme heat; she could frequently twist and stoop, never

15

crouch or climb ladders, and could occasionally climb stairs. (Tr. 912). Howell would be absent more than twice per month due to her physical impairments. (*Id.*). CNP Binkley also completed a mental impairment opinion form on December 26, 2017. (Tr. 917-19). In it, CNP Binkley marked that Howell had no limitations related to her mental health, stating that Howell had a history of depression with two to three depressive episodes per year, managed with medication. (*Id.*).

CNP Binkley completed a second physical limitations medical opinion form on July 23, 2018, after a 12-month treating relationship, again noting a fair prognosis for Howell's fibromyalgia. (Tr. 1104-06).[2] CNP Binkley again opined that Howell was limited to sitting, standing, and walking for less than 2 hours, and could sit and stand for less than 10 minutes at a time. (Tr. 1104). CNP Binkley again included a handwritten explanation that Howell has increased pain when standing or sitting longer than 10 minutes at a time. (*Id.*). Howell needed to shift positions at will and would need to take unscheduled breaks every hour during an eight-hour workday. (*Id.*). CNP Binkley again opined that Howell should avoid exposure to all environmental hazards except for extreme heat; she could frequently twist and stoop, never crouch or climb ladders, and could occasionally climb stairs. (Tr. 1106). Howell would be absent more than twice per month due to her physical impairments. (*Id.*).

CNP Binkley submitted a third medical opinion form on March 3, 2020. (Tr. 1994-96). In it, CNP Binkley noted that Howell could lift and carry up to five pounds frequently, but never more than that, and could reach bilaterally occasionally; she could frequently handle and finger bilaterally. (Tr. 1994-95). CNP Binkley included handwritten notes in support, stating that the limitations were due to Howell's pain in her shoulder and wrist, and that she could not raise her

---

[2] It does not appear that CNP Binkley completed the second page of the form. (*See* Tr. 1105).

arms above 90 degrees. (Tr. 1994). CNP Binkley opined that Howell could stand and walk for up to 5 minutes at one time, and could sit for up to 20 minutes at one time; she could not use her feet due to left ankle pain. (Tr. 1995). She could occasionally bend, crouch/squat, and climb steps; she could never crawl, climb ladders, or reach above shoulder level. (*Id.*). CNP Binkley opined that Howell's condition was likely to deteriorate if placed under stress, due to increased anxiety with stressful conditions. (*Id.*). Howell had chronic issues since at least March 7, 2016, and she would likely be absent from work two or more days per month. (Tr. 1996).

### 2.  Michael Wuebker, Ph.D.

On May 4, 2017, Howell underwent a consultative psychological examination with Michael Wuebker, Ph.D. (Tr. 652-57). Dr. Wuebker diagnosed Howell with an Other Specified Depressive Disorder, recurrent brief depression, and an Other Specified Anxiety Disorder, limited symptoms attacks. (Tr. 656). Dr. Wuebker noted Howell functioned in the average range of intelligence and would be able to understand and apply one step and a few complex workplace instructions; that she maintained sufficient attention to answer questions; that she exhibited no behaviors that would suggest difficulty getting along with coworkers and supervisors; and that she could respond appropriately to work setting stressors. (Tr. 657).

Dr. Wuebker examined Howell again on March 29, 2018, this time the examination was directly related to the current disability claim, with the same diagnosis. (Tr. 977-82). Dr. Wuebker's opinion of Howell's functional limitations did not materially change, and he provided the same notes: Howell functioned in the average range of intelligence and would be able to understand and apply one step and a few complex workplace instructions; that she maintained sufficient attention to answer questions; that she exhibited no behaviors that would suggest

17

difficulty getting along with coworkers and supervisors; and that she could respond appropriately to work setting stressors. (Tr. 982).

### 3. State Agency Reviewing Opinions

On April 4, 2018, at the initial level, state agency reviewer William Bolz, M.D., opined that Howell was limited to light level exertional work with the following limitations: frequent climbing of ramps/stairs; occasional climbing of ladders/ropes/scaffolds; stooping; kneeling; crouching; and crawling. (Tr. 85-87). On April 8, 2018, also at the initial level, state agency reviewer Carl Tishler, Ph.D., opined that Howell had mild impairment in the ability to understand, remember, or apply information; interact with others; and adapt or manage herself; she had no limitation in her ability to concentrate, persist, or maintain pace. (Tr. 83).

On June 24, 2018, at the reconsideration level, Angel Bucci, D.O., reviewed the record and affirmed Dr. Bolz's findings. (Tr. 104-05). On June 25, 2018, Joseph Edwards, Ph.D., affirmed Dr. Tishler's findings. (Tr. 101-02).

### 4. Bobbie Stoner, MS, LSW, LICDC-CS

On March 2, 2020, Ms. Stoner completed a mental health medical source statement. (Tr. 2004-06). Ms. Stoner opined that Howell had marked impairment in social interaction, sustained concentration and persistence, and ability to adapt, due to her depression and fibromyalgia. (*Id.*). She also checked a box stating that Howell had extreme limitations in her ability to perform at production levels expected by most employers. (Tr. 2005). Ms. Stoner also checked boxes indicating that Howell would miss work more than five times a month and that her condition would deteriorate if she were placed in the stress of full-time work. (Tr. 2006).

### 5. Vincent Carr, D.O.

On March 24, 2024, Vincent Carr, D.O., completed a medical interrogatory regarding Howell's physical impairments after reviewing her medical record from March 7, 2016 through March 19, 2024. (Tr. 4043-55). Dr. Carr confirmed diagnoses of migraines, fatigue, bilateral carpal tunnel syndrome, anxiety, and muscle weakness, as well as treatment for mild thyroid disease and diabetes; she also appeared to meet the diagnosis of other specified depressive disorders and other specified anxiety disorders. (Tr. 4046-48). Dr. Carr also noted that Howell's record contained "numerous" accounts of fibromyalgia starting in 2006, but there was no documentation of trigger point testing on soft tissue to confirm the diagnosis. (Tr. 4046). Dr. Carr did not specifically opine as to any work-related impairments, also he did note that she would be limited in her ability to lift/carry and reach due to bilateral carpal tunnel syndrome, and that she used an assistive device for her right knee meniscal and anterior ligament tears. (Tr. 4049-51). He opined that Howell could never work at unprotected heights and that she would need to work in a quiet space. (Tr. 4053). He also opined that Howell could not perform activities like shopping, could not travel without a companion for assistance, and could not use standard public transportation. (Tr. 4054). He further noted that Howell was involved in a motor vehicle accident in June 2022, but those records were not available for review. (*Id.*).

### 6. Matthew Dorweiler, M.D.

On March 27, 2024, Matthew Dorweiler, M.D., reviewed Howell's medical record and completed a medical interrogatory. (Tr. 4057-62). Dr. Dorweiler opined that Howell could occasionally lift and carry up to 50 pounds; frequently up to 20 pounds, and continuously up to 10 pounds due to chronic generalized pain. (Tr. 4057). He further opined Howell was limited to sitting for eight hours, and up to four hours at a time; and could perform up to four hours of

standing and walking, for up to two hours at a time; she did not need a cane to ambulate. (Tr. 4058). Dr. Dorweiler opined she had no bilateral upper or lower extremity limitations. (Tr. 4059). He further opined that Howell could frequently climb stairs and ramps; occasionally balance, stoop, kneel, crouch, and crawl; and never climb ladders or scaffolds. (Tr. 4060). She could never work at unprotected heights; with moving mechanical parts; or operate a motor vehicle. (Tr. 4061). He found she had no limitations in other physical activities. (Tr. 4062).

### 7.    Beverly Froning, PMHNP-APRN

On December 10, 2024, Beverly Froning, PMHNP-APRN, completed a medical source statement regarding Howell's mental health. (Tr. 4077-79). In it, she noted that Howell had been under her care since March 28, 2024. (Tr. 4079). She also included a statement that Howell experiences depression, anxiety, and PTSD; that she has had many medication trials; and that Howell may have had a traumatic brain injury from a motor vehicle accident. (*Id.*). In NP Froning's opinion, Howell had extreme limitations in the ability to accept instruction from supervisors; respond appropriately to coworkers or peers; to perform at expected production levels; to behave predictably, reliably, and in an emotionally stable manner; and the ability to tolerate customary work pressures. (Tr. 4077-78). Howell had marked impairment in the ability to related to the general public; perform and complete work tasks at a consistent pace; to use appropriate judgment; to respond appropriately to changes in the work setting; to remember instructions; and in her awareness of normal hazards. (*Id.*). However, NP Froning did not think Howell would require a limitation to superficial contact with others; but she would be absent from work five or more days per month and would likely deteriorate if placed under the stress of a full-time job. (Tr. 4077, 4079).

20

### D.    Administrative Hearing Evidence[3]

#### 1.    November 14, 2022 Administrative Hearing

Howell, represented by counsel, testified in a second hearing before ALJ Vitello on November 14, 2022. (Tr. 2234). She testified that in 2021, she would have migraines on a weekly or daily basis, but she was not aware of any triggers for her migraines. (*Id.*). The migraines would start as a dull tension and then turn sharp, starting in the back of her head and working its way up to her eyes. (*Id.*). She was prescribed Topamax and Imitrex for the migraines, but was instructed to take the Imitrex after she had a migraine, not as a preventative. (Tr. 2234-36). Howell had once attempted seeing a neurologist for her migraines, but had a bad reaction to gabapentin prescribed to her and could not get a referral for a new neurologist. (Tr. 2237-38). She has never undergone an MRI or other testing for her migraines; she was only prescribed pills. (Tr. 2238-39). She treated with Dr. Burnica in pain management for her migraines and was given a nerve block in March 2022 without relief. (Tr. 2239, 2241). She received three nerve blocks without relief. (Tr. 2241).

Howell had followed with Dr. Sell for eight years for her primary care, including migraine, depression, and fibromyalgia, but had recently switched providers to a Dr. Sharma, and a Nurse Binkley in his office. (Tr. 2239-40). Howell would treat with Nurse Binkley once or twice per month. (Tr. 2242).

Howell also began seeing a chiropractor for neck pain that had occurred after a motor vehicle accident. (Tr. 2243-44). She was in the hospital for three weeks after the accident, and then in a nursing home for a month after that. (*Id.*). She had additional outpatient therapy for her right leg and wrist for the months of July and August. (Tr. 2245). She was scheduled for an ACL,

---

[3] Although three hearings are available in the record, I provide only the two most recent, based on relevance to the present case.

MTL, and matriculas repair in her right knee on November 23. (*Id.*). She had already had surgery on her right wrist at the time of the hearing. (Tr. 2245-46). Through Nurse Binkley, Howell went to physical therapy for her right arm and received some improvement. (Tr. 2249). Howell also took Lasix 40 mg for her feet swelling. (Tr. 2258).

Howell described having issues raising her right arm over her head beginning in March 2020. (Tr. 2247-49). She was not sure of the reason behind this issue, but believed it may have been related to fibromyalgia. (Tr. 2249). Her fibromyalgia was worse in cold or rainy weather, and she would need to bundle up and take extra medicine on those days. (Tr. 2261).

Howell also described having some issues with prescription substance abuse, and will take extra Tramadol if she is having a lot of pain. (Tr. 2250-51).

Howell also treats every two to three weeks with a therapist. (Tr. 2252). She treats with a psychiatrist, Meg Pearson who prescribes Nortriptyline, Lexapro, and Disbar. (Tr. 2254-55). She testified that she had a psychiatric hospitalization in fall of 2019 because she was suicidal. (Tr. 2255). She remained on the same medications after that hospitalization, but the dosages were increased. (Tr. 2255-56). Her dosages increased five times in the three years since the hospitalization. (*Id.*). She testified to having panic attacks once or twice per week, where she starts shaking and crying and feels like she cannot breathe. (Tr. 2262).

Howell testified that, because of the tears in her knee, she could walk for 20 minutes at a time before needing to sit and then would sit and rest for an hour before walking again. (Tr. 2259-60).

A Medical Expert ("ME") Vladimir Karpitsky then testified. (Tr. 2263). ME Karpitsky specialized in neurology. (*Id.*). He testified that the records did not support Howell's allegations regarding the frequency and intensity of her migraines. (*Id.*). He noted that, as an example, at an

office visit to establish care on August 6, 2022, Howell did not mention migraines. (*Id.*). ME Karpitsky also noted that Howell had multiple pain syndromes but that his specialization would not allow him to opine on a diagnosis. (Tr. 2264). After questioning, ME Karpitsky also noted that a May 17, 2018 visit described headache symptoms of nausea, vomiting, blurring vision, and photophobia, occurring four times per week. (Tr. 2264-65). ME Karpitsky also questioned what effect a fibromyalgia diagnosis might have on Howell's migraine frequency. (*Id.*). Fibromyalgia was also not established in the medical record, but could also be the cause of Howell's discomfort. (Tr. 2265).

Vocational Expert ("VE") Gene Burkhammer then testified. (Tr. 2266). Howell had past relevant work as a nursing assistant, DOT 355.764-014, SVP 4. (Tr. 2266-67). ALJ Vitello then presented the following hypothetical: a younger individual with a high school education, limited to light work, with no climbing of ladders, ropes, or scaffolds; no assembly-line work dictated by an external source; frequent handling and fingering, overhead reaching, pushing, and pulling; can understand, remember, and carry out simple instructions that require little or no judgment in a short period of time to learn; frequent interaction with the public, coworkers, and supervisors; no dangerous machinery, and no extreme cold. (Tr. 2267). VE Burkhammer testified the following light SVP 2 jobs would be available: office helper, DOT 339.567-010, with 120,000 jobs in the national economy; housekeeping, cleaner, DOT 323.687-014, with 500,000 jobs in the national economy; and sales attendant, DOT 299.677-010, with 160,000 jobs in the national economy. (Tr. 2267-68).

For the second hypothetical, VE Burkhammer testified that those same jobs would remain if the postural limitations were reduced to occasional. (*Id.*). For the third hypothetical, if both the postural limitations and the interactions with public, coworkers, and supervisors were

23

reduced to occasional, the sales attendant job would be eliminated and replaced with mail clerk, light, SVP 2, DOT 209.687-026, with 140,000 jobs in the national economy. (Tr. 2268).

The fourth hypothetical contemplated a younger individual with at least a high school education and a reduced range of sedentary work, meaning no climbing ladders, ropes, or scaffolds; engaging in the remaining postural activities on an occasional basis, no assembly-line work dictated by an external source, frequent handling and fingering, overhead reaching, and pushing and pulling; could frequently interact with the public, coworkers, and supervisors; simple instructions that require little or no judgment in a short period of time to learn; could perform frequent handling and fingering, overhead reaching, pushing, and pulling. (Tr. 2269). VE Burkhammer testified to the following sedentary, SVP 2 jobs: charge account clerk, DOT 205.567-014, with 100,000 jobs in the national economy; food and beverage order clerk, DOT 209.567-014, with 140,000 jobs in the national economy; and document specialist, DOT 249.587-018, with 100,000 jobs in the national economy. (*Id.*).

The fifth hypothetical contemplated the same as the fourth at a reduced range of sedentary, but that interactions would be reduced to occasional. (*Id.*). VE Burkhammer testified that this limitation would eliminate the charge account clerk position, but that the other two could still be performed. (Tr. 2269-70). However, the individual could work as a sorter, sedentary, SVP 2, DOT 521.687-086, with 120,000 jobs in the national economy. (*Id.*).

VE Burkhammer also testified that an employer will tolerate up to 15% of time off-task during the workday, outside of scheduled breaks.[4] (Tr. 2270). No competitive work would be available if an individual had issues with attention and concentration requiring frequent redirection and repetition. (Tr. 2271). Likewise, all competitive work would be eliminated if an

---

[4] The record is marked "[INAUDIBLE]" for VE Burkhammer's testimony regarding absences. (Tr. 2270).

individual needed to elevate their leg during the workday outside of the usual break periods. (*Id.*). And if a person's mental health symptoms caused them to have trouble handling regular workplace stress and maintaining emotional stability more than 15% of the time, happening frequently and to a high degree, then it would be work preclusive. (Tr. 2271-72).

ALJ Vitello concluded the hearing, but kept the record open for 30 days for Howell to submit additional information, such as a headache questionnaire from Nurse Binkley, to support Howell's testimony regarding the frequency and intensity of her migraines. (Tr. 2273).

### 2. March 18, 2025 Administrative Hearing

Howell, represented by counsel, attended the March 18, 2025 hearing before the ALJ along with ME James Haynes, M.D., and VE Suman Srinivasan, who testified at the relevant hearing preceding the final decision of the Commissioner. (Tr. 3818).

ME Haynes testified that he had never treated or examined Howell prior to the hearing, nor had he discussed the merits of the matter with anyone. (Tr. 3819-20). ME Haynes had reviewed the entirety of Howell's medical record prior to the hearing and had sufficient evidence to establish the presence of medically determinable impairments. (Tr. 3820). ME Haynes noted that Howell had "very major psychological issues" and "some physical issues" but that, in his opinion, Howell did not have a neuromuscular disease; he was also concerned about a suicidal episode contained in the record, as well as a self-reported addiction to ibuprofen and opiates. (Tr. 3821). ME Haynes explained that he was not equipped to opine on Howell's psychological issues because he is not a psychologist. (*Id.*). However, he believed that a major motor vehicle accident on June 6, 2022 would support a one-year closed period of disability. (Tr. 3821-22). In ME Haynes' opinion, a light physical demand level would be appropriate thereafter. (Tr. 3822-23).

25

VE Srinivasan then testified. (Tr. 3825). The ALJ presented the following hypothetical: an individual of Howell's age, education, and work experience, who has the residual functional capacity for work at the light exertional level; except no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; occasional use of the bilateral lower extremities with operation of foot controls; manipulative limitations of frequent use of the bilateral upper extremities for reaching, handling, and fingering; avoiding all exposure to moving mechanical parts; and avoiding extreme cold and high exposed places; they can understand, remember, and carry out simple instructions for work not requiring a specific production rate, such as assembly line work; no work requiring hourly quotas; capable of using judgment to make simple, work-related decisions with occasional changes in a routine work setting; frequent interaction with the general public, coworkers, and supervisors. (*Id.*). VE Srinivasan testified that this hypothetical individual could be a sales attendant, DOT 299.677-010, with 150,000 jobs in the national economy; store cashier, DOT 211.462-010, with 460,000 jobs in the national economy; and counter attendant, DOT 311.477-014, with 163,000 jobs in the national economy; all jobs were light exertional level and SVP 2. (Tr. 3826).

The ALJ then gave a second hypothetical, again at the light exertional level. (*Id.*). The second hypothetical included the same limitations as before, except including a sit/stand option where the hypothetical individual could sit or stand, alternating positions for 1 or 2 minutes in the immediate vicinity of the workstation, no more frequently than every 30 minutes, while remaining on task for at least 90% of the work period. (*Id.*). VE Srinivasan testified that work would be available, but the jobs described for the first hypothetical would no longer work. (Tr. 3827). Available jobs for the second hypothetical at the light unskilled level, SVP 2, would

26

include a merchandise marker, DOT 209.587-034, with 165,000 jobs nationally; routing clerk, DOT 222.687-022, with 125,000 jobs nationally; and collator operator, DOT 208.685-010, with 30,000 jobs nationally. (*Id.*).

The ALJ gave a third hypothetical, including all of the limitations in the first two hypotheticals, except that the individual would be limited to sedentary work. (*Id.*). VE Srinivasan found four sedentary, unskilled jobs including an information clerk, DOT 237.367-046, 6,000 jobs in the national economy; inspector and tester (no DOT provided), 10,000 jobs in the national economy; and touch-up screener, DOT 726.684-110 (no number of jobs in the national economy provided); and document preparer, DOT 249.587-018, with 14,000 jobs in the national economy. (*Id.*).

VE Srinivasan also testified that a hypothetical individual that is consistently off task for more than 10% of the work period would have no work in the national economy. (Tr. 3828). Employers tolerate up to 10% of time off task, not including breaks, and tolerate no more than one unscheduled absence per month. (Tr. 3829). Partial absences were not included in VE Srinivasan's testimony, as each employer handles partial absences differently. (Tr. 3832). It would likewise be work preclusive if the hypothetical individual would need to alternate between sitting and standing every 10 minutes, would be limited to lifting and carrying no more than 5 pounds, and would be limited to using their bilateral upper extremities for reaching in any direction on only an occasional basis. (Tr. 3830-31). It would be work preclusive for the individual to be impaired 26-50% of the workday in their ability to accept instruction, respond appropriately to criticism from supervisors, behave in an emotionally stable manner, and tolerate customary work pressures. (Tr. 3831). It would also be work preclusive if an individual needed to elevate their legs for at least 50% of the workday or work week. (*Id.*). It was likewise work

27

preclusive if the individual needed extra breaks of 10 to 15 minutes in addition to those breaks scheduled by their employer. (Tr. 3831-32).

### IV. The ALJ's Decision

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2021.

2. The claimant did not engage in substantial gainful activity during the period from June 17, 2017 through her date last insured of September 30, 2021 (20 CFR 404.1571 et seq.).

3. Through the date last insured, the claimant had the following severe impairments: Obesity, depression, fibromyalgia, hypothyroid, anxiety, history of chronic migraines/headaches, diabetes mellitus, bilateral lower extremity edema, insomnia, sciatica/disorders of the skeletal spine, and multiple tears of the right knee, grade III chondromalacia of the patellofemoral (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: Postural limitations of no climbing of ladders, ropes, or scaffolds. Frequent climbing of ramps and stairs. Occasional balancing, stooping, kneeling, crouching, and crawling. Occasional use of the bilateral lower extremities for operation of foot controls. Manipulative limitations of frequent use of the bilateral upper extremities for reaching, handling, and fingering. Environmental limitations to avoid all exposure to moving mechanical parts, extreme cold, and high exposed places. Can understand, remember and carry out simple instructions, for work not requiring a specific production rate, such as assembly line work, nor work requiring hourly quotas. Capable of using judgment to make simple work-related decisions, with occasional changes in a routine work setting. Frequent interaction with the general public, coworkers, and supervisors.

6. The claimant has no past relevant work (20 CFR 404.1565).

7. The claimant was born on November 3, 1970 and was 50 years old, which is defined as a younger individual age 18-49, on the date last insured. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

28

**8.** The claimant has at least a high school education (20 CFR 404.1564).

**9.** Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568).

**10.** Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

**11.** The claimant was not under a disability, as defined in the Social Security Act, at any time from June 17, 2017, through September 30, 2021, the date last insured (20 CFR 404.1520(g)).

(Tr. 3777-3804).

## V. Law & Analysis

### A. Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1. whether the claimant is engaged in substantial gainful activity;

2. if not, whether the claimant has a severe impairment or combination of impairments;

3. if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4. if not, whether the claimant can perform their past relevant work in light of his RFC; and

5. if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.       Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not

30

uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

## VI.  Discussion

Howell brings one issue for this Court's consideration: whether the ALJ violated 20 C.F.R. § 404.1520c by failing to properly evaluate the opinions provided by the treating certified nurse practitioner.[5] (ECF Doc. 7, p. 2).

As Howell presents, CNP Binkley treated her for the entire relevant time period, and provided treatment notes and three separate medical source statements. (*Id.* at p. 10). Even so, the ALJ rejected CNP Binkley's opinions as unsupported by and inconsistent with the record evidence. (*Id.*). Howell argues that, despite invoking the required terms, the ALJ did not fully address the required factors of supportability and consistency, and instead relied on certain "normal" examination findings not fully relevant to CNP Binkley's assessments. (*Id.* at p. 12). Howell continues with a review of her symptoms and medical evidence to support CNP Binkley's opinions. (*Id.* at pp. 12-15).

The Commissioner focuses on whether the ALJ properly followed 20 C.F.R. § 404.1520c's requirement to evaluate the supportability of CNP Binkley's multiple opinions.

---

[5] Howell's brief makes passing reference to error with "the opinion evidence provided by Dr. Finnerty and Dr. Heinemann" but it does not appear that she treated with either doctor. (ECF Doc. 7, p. 10). I therefore focus my review only to the issue raised and fully argued with respect to CNP Binkley. (*See generally id.* at pp. 10-15).

31

(ECF Doc. 9, pp. 7-12). The Commissioner argues that the ALJ properly explained their consideration of the supportability of each of CNP Binkley's opinions, thereby providing substantial evidence to support the decision. (*Id.* at pp. 7-10). The Commissioner continues that the other evidence Howell points to in her brief does not undermine the ALJ's decision – rather, it invites this Court to reweigh the evidence, which it may not do. (*Id.* at p. 10). As a result, the Commissioner asks this court to reject Howell's argument and affirm the ALJ's decision. (*Id.* at p. 11).

On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a).

At Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2). If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must articulate what factors were most persuasive in differentiating the opinions. 20 C.F.R. § 404.1520c(b)(3) (internal citations omitted) (emphasis added). Other factors include: (1) the length, frequency,

purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)-(5).

Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion. *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

Even when an ALJ finds a medical source's opinion persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Rather, the ALJ is required to provide "good reasons in the opinion—not an exhaustive factor-by-factor analysis." *Chicora v. Comm'r of Soc. Sec.*, 852 F. App'x 968, 971 (6th Cir. 2021) (internal quotations omitted). So long as the ALJ's RFC determination considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) ("The ALJ parsed the medical reports and made necessary decisions about which medical findings to credit, and which to reject. Contrary to [the claimant's] contention, the ALJ had the authority to make these determinations."). The "mere existence of a contrary opinion or piece of evidence in the record does not undermine the ALJ's notice of good reasons." *Chicora*, 852 F. App'x at 971 (internal quotations omitted). However, an ALJ improperly "cherry-picks" evidence when their decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why she chose to credit one portion over another. *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-

cv-1087, 2018 WL 1933405, at *13 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513

F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D.

Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the

ALJ must explain why he did not include the limitation in his RFC determination).

I provide excerpts relating to CNP Binkley from the ALJ's final decision dated April 7,

2025:

> The claimant also treated with her primary care provider, Kim Binkley, CNP for her headache. The claimant reported that she thought the headache was related to her anxiety and she was given Toradol and Phenergan as an abortive medication. (Exhibit 26F/38 and 53).

> Shortly thereafter, CNP Binkley completed a medical source opinion statement in which she opined that the claimant can sit and stand for 10 minutes at one time, she can sit, stand/walk less than 2 hours in an 8 hour working day, she needs a job that permits shifting positions at will, from sitting, standing, or walking, she needs to take unscheduled breaks 8 in an 8 hour shift, she should avoid exposure to extreme cold, high humidity, fumes, odors, dusts, gases, perfumes, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. She can frequently twist and stoop, occasionally climb stairs, and never crouch or climb ladders. She will be absent from work more than twice per month (Exhibit 27F). The undersigned find the opinion to be unpersuasive as the provider did not provide a function by function analysis in support of the opined limitations. Moreover, **the physical exam findings documented in CNP Binkley's records around this time do not support the restrictive limitations noting normal respiratory findings, regular heart rate, no calf tenderness, negative Homan's sign, normal memory, appropriate mood, intact neurological exam, normal range of motion, and trace bilateral ankle edema (Exhibit 26F/37-40 and 28F/1-3). The opinion is also not consistent with other evidence of record around this time which noted clear breath sounds, and a steady gait (Exhibit 25F/8).** Further motor exam findings revealed reduced shoulder strength of 4+/5 bilaterally and reduced elbow strength of 4+/5 bilaterally while, otherwise, strength findings were 5/5 and she was observed to have a normal gait and station (Exhibit 30F/34). Rheumatology exam findings detailed normal range of motion and no tenderness of the upper and lower extremities (Exhibit 16F/2-3 and 7-8). Treatment records from CNP Binkley from that same time period noted that the claimant did not appear ill, she had a body mass index of 43.6 kg/m2, she had a normal mood, she exhibited normal range of motion, was alert, and had bilateral lower edema present with tenderness in the Achilles area with flexion (Exhibit 28F/1-3). She was to have ultrasound imaging of her legs and was provided with a refill of her Imitrex while she was awaiting a follow up appointment with neurology (Exhibit 28F/3-4).

. . .

In early 2019, the claimant continued to treat with Kim Binkley, APRN-CNP. She endorsed having terrible pain with the weather changes and was using Tylenol for pain. She was not exercising but was doing some stretching at home. She was treating with neurology for her headaches but did not know when her next appointment was. She was noted to have a body mass index of 43.77 kg/m2. She exhibited swelling in the bilateral ankles and normal range of motion. She appeared alert and had normal strength. (Exhibit 35F/39-42). She was to increase her water intake and was to eat a healthy diet. She was prescribed Zanaflex 4 times daily as needed for fibromyalgia pain and was to follow up with neurology for headaches. She was provided a refill of Imitrex in the meantime. (Exhibit 35F/41-42).

. . .

In the same month, the claimant also treated with CNP Binkley at which time she reported that she was able to vacuum and do housework without shortness of breath and she denied having any chest pain or shortness of breath. While she reported having mild leg swelling, unchanged (Exhibit 35F/30).

. . .

In early August 2019, the claimant reported to CNP Binkley that she felt worthless and felt like a burden to others. She was wanting to lay around and sleep all day. She presented as tearful and endorsed having occasional suicidal thoughts (Exhibit 35F/16). She was observed to have a normal mood and affect and normal behavior. She was not suicidal on exam and denied having suicidal plans. She was noted to have edema and pain with palpation to the right lower paraspinous muscles and right gluteal. There was diffuse generalized muscle pain with palpation noted. (Exhibit 35F/16-17). X-rays of her lumbar spine were ordered, and she was administered a Toradol injection and referred to physical therapy (Exhibit 35F/17). Additionally noted, she was to treat with psychiatry and her medications were adjusted with an increase in Abilify and decreased in Cymbalta noted. She was also started on low dose Lexapro at bedtime (Exhibit 35F/17).

Later on in August 2019, the claimant's primary care provider CNP Binkley referred the claimant to treat with psychiatry. In addition, her dosage of Lexapro and Nortriptyline was increased. Earlier in the month her Cymbalta was discontinued. The claimant was working on transitioning to living with her mother in law and brother in law which increased her anxiety. She shared her mood had not been very good lately although she was able to complete work on around the house and was attending physical therapy for her back. She was sleeping approximately 3 hours at a time and was taking Melatonin at night (Exhibit 35F/5-7 and 12).

. . .

In early 2020, the claimant treated with Kim Binkley, CNP. It was noted that she had recently started diabetic medications including Metformin, Glimepiride, and Lantus. Her blood sugars were running between 83-147 and she was doing better (Exhibit 42F/15). Her Metformin dosage was increased (Exhibit 42F/22-23).

In March 2020, Kim Binkley, CNP completed a medical source statement in which she opined that since March 7, 2016, the claimant can lift and carry 1-5 pounds frequently and 6-50 pounds never. She can occasionally use her right and left arm for reaching in any direction. She can frequently use her bilateral hands for handling and fingering. She can stand for 5 minutes at one time, walk for 3-5 minutes at one time, and sit for 20 minutes at one time (Exhibit 40F/1-3) She can occasionally bend, crouch/squat, and climb steps, and she can never crawl and climb ladders. She cannot reach above shoulder level and her condition is likely to deteriorate if placed under stress, particularly stress associated with a job (*Id*.). Lastly, she is likely to have partial or full day unscheduled absences occurring 2 or more days per month (*Id*.)

In a separate statement made around the same time, CNP Binkley noted that the claimant is unable to lift arms greater than 90 degrees due to shoulder pain, she drops objects frequently, and she is unable to lift anything heavier than a gallon of milk. Due to her chronic pain and other health conditions she would miss work frequently or would be sent home on a daily basis (Exhibit 40F/4). **The undersigned finds the opinions at 40F to be mostly unpersuasive as the opinions are not accompanied by a function by function analysis and are not supported by the provider's own exam findings noting no musculoskeletal exam findings in early 2020 (Exhibit 42F/16). Further noted, the examiner's own exam reports reflect that the shoulder pain was a "new complaint" as of March 2020, while the opined limitations are referenced back to March 2016. While CNP Binkley's finding do include bilateral shoulder pain in March 2020, the restrictive opined exertional limitations are not supported by the record with other strength findings reflecting 5/5 strength and as she was observed to have a normal gait and station (Exhibit 2F/9 and 31-32, 30F/34, 46F/106, and 25F/8). Further the opinion is not consistent with the claimant's noted ability to complete household chores, and travel (Exhibits 35F/30, 24F, 48F/136, and 4E). Overall, the claimant's outlined treatment course and the reported history of no attendance issues does not support that she would be absent from work due to her impairments (Exhibits 8F and 24F).** Further the claimant endorsed improvement in her pain (Exhibit 16F, 20F/4-5, and 48F/136-137 ). **While the opinion that she can frequently handling and finger with the bilateral hands and occasionally stoop and crouch is persuasive as the limits are supported by and consistent with the claimant's combined severe impairments and in considering the longitudinal evidence outlined herein and considering her generalized pain.** Specifically accounting for her elbow and shoulder strength (4+/5) while noting her documented grip strength of 5/5 and non-

severe carpal tunnel syndrome (Exhibit 20F/9-10, 16F/7-8, 17F/1-3, 20F/4, and 31F/26). As such **these limitations have been accounted for and noting that the aforementioned record supports frequent reaching with the bilateral upper extremities. As to limitations not included in the adopted RFC, the undersigned has further considered rheumatology exam findings that detailed 5/5 grip strength bilaterally, 5/5 power in all muscle groups, and no synovitis or tenderness of the joints (Exhibit 16F/7-8) as well as to the above cited references to a normal gait and strength and the claimant's activities of daily living and finds that the opined limitations are not fully consistent.**

The claimant's treating provider, Kim Binkley, CNP completed a medical opinion statement in which it was opined that the claimant can walk 2 city blocks without rest, can sit and stand 10 minutes at one time, and can sit, stand, and walk less than 2 hours in an 8 hour working day. She needs the ability to shift positions at will and will need hourly unscheduled breaks (8 in an 8 hour shift). She will need 8 hours of rest at night. She should elevate her legs 3 feet high 50% of an 8 hour workday (Exhibit 17F/4-5). She can lift and carry less than 10 pounds frequently, 10 pounds occasionally, and 20 to 50 pounds never. She has no limitation with repetitive reaching, handling, or fingering. She can use her hands/fingers/arms 100% of an 8 hour working day for grasping turning, twisting objects, and fine manipulation. She can use her arms for reaching overhead 50% of an 8 hour working day (Exhibit 17F/5). She can bend and twist at the waist 50% of an 8 hour working day. She should avoid extreme cold, humidity, fumes, odors, dusts, gases, perfumes, cigarette smoke, soldering fluxes, solvents/cleaners, and chemicals. She can frequently twist, and stoop, can never crouch and climb ladders, and can occasionally climb stairs (Exhibit 17F/6). She would likely be absent from work more than twice a month (Exhibit 17F/6).

The provider also completed a mental ability, and aptitudes check the box form noting that claimant had good functioning in some areas and unlimited or very good function in other areas (Exhibit 17F/7-9). Lastly, she opined the claimant can manage her own benefits (Exhibit 17F/9, 18F, and 19F). Nurse Binkley also completed a statement in which she noted that the claimant cannot sit or stand for more than 10 minutes without significant increase in pain. She cannot climb stairs or crouch. She can bathe and brush her teeth, but this causes exhaustion and pain (Exhibit 17F/36-39). As to the claimant's opined mental abilities, the undersigned finds the opinion to be unpersuasive, as CNP Binkley is not a specialist in psychiatry. Moreover, she observed the claimant's mood to be normal (Exhibit 28F/1-3 and 35F/16). Moreover, the undersigned finds the overall opined physical limitations to be unpersuasive. **The opined pulmonary limitations are not persuasive as the opinion is not supported by the provider's own records and her opinion is not accompanied by a function by function analysis. The provider's records noted normal breath sounds and no signs of respiratory distress (Exhibit 28F/2, 42F/16, 22, and 31) Further the opinion is not consistent with other evidence of record which likewise documented clear breath sounds (Exhibit 20F/9-10, 25F/8, and 34F/32-36). The opined exertional**

**limitations are not supported by the examiner's findings which did not always contain a musculoskeletal exam (Exhibit 42F/16, 22, and 31). While at other times she documented normal range of motion findings (Exhibit 28F/1-3 and 35F/39-42). Nor is the opinion consistent with other evidence of record which noted normal range of motion and strength findings and a normal gait (Exhibit 23F/2 and 5, 47F/211 and 215-217, 16F, 30F/64, 20F/4-5, 23F and 25F/8). While she had some reduced elbow and shoulder strength (4+/5) while records documented her grip strength of 5/5 and EMG findings showed signs of carpal tunnel syndrome (Exhibit 20F/9-10, 16F/7-8, 17F/1-3, 20F/4, and 31F/26), the opinion is not fully consistent with these findings. Thus the claimant's upper extremity findings have been accounted for by so limiting her light work with manipulative limitations of frequent use of the bilateral upper extremities for reaching, handling, and fingering. As to elevating her legs the treatment records did not identify any such recommendation and noted only that she should use compression hose, make dietary changes, was to walk more, and was prescribed diuretics. (Exhibit 48F/123-125, 57F/143, 42F/5, 13F/13, 35F/41-42, and 48F/190). Lastly, the claimant did not require any extended hospitalizations related to her severe impairments during the relevant period and did not report any history of attendance issues when working (Exhibit 8F and 24F). Thus the opined absences is neither supported nor consistent with the record.**

(Tr. 3791-3801 (emphasis added)). As this full accounting shows, the ALJ considered all of CNP Binkley's opinions in the regulatory terms of supportability and consistency. (*See id.*). Certainly, Howell's treatment record with CNP Binkley reveals that she has significant deficits impairing her activities of daily living. The treatment record shows that Howell suffered from regular migraines, arthralgia, and myalgia pain, leg swelling, diabetes, and reduced upper extremity range of motion, among other impairments.

But here, the ALJ did as the regulations require. The ALJ's decision thoroughly considered Howell's full medical record, and compared CNP Binkley's multiple opinions against her own treatment records to demonstrate where those opinions were supported, or not, and what accommodations were warranted. (*See, e.g.*, Tr. 3800 ("Moreover, the undersigned finds the overall opined physical limitations to be unpersuasive. The opined pulmonary limitations are not persuasive as the opinion is not supported by the provider's own records and her opinion is not

38

accompanied by a function by function analysis. The provider's records noted normal breath sounds and no signs of respiratory distress."), Tr. 3801 ("As to elevating her legs the treatment records did not identify any such recommendation and noted only that she should use compression hose, make dietary changes, was to walk more, and was prescribed diuretics.")). This explanation suffices for purposes of substantial evidence on review. The ALJ also provided rationale regarding the consistency of CNP Binkley's opinions against the other medical evidence in Howell's record. (*See, e.g., id.*, ("Further the opinion is not consistent with other evidence of record which likewise documented clear breath sounds (Exhibit 20F/9-10, 25F/8, and 34F/32-36). The opined exertional limitations are not supported by the examiner's findings which did not always contain a musculoskeletal exam (Exhibit 42F/16, 22, and 31). While at other times she documented normal range of motion findings (Exhibit 28F/1-3 and 35F/39-42). Nor is the opinion consistent with other evidence of record which noted normal range of motion and strength findings and a normal gait (Exhibit 23F/2 and 5, 47F/211 and 215-217, 16F, 30F/64, 20F/4-5, 23F and 25F/8). While she had some reduced elbow and shoulder strength (4+/5) while records documented her grip strength of 5/5 and EMG findings showed signs of carpal tunnel syndrome (Exhibit 20F/9-10, 16F/7-8, 17F/1-3, 20F/4, and 31F/26), the opinion is not fully consistent with these findings.").

With this, Howell's assertions that the ALJ did not properly follow 20 C.F.R. § 404.1520c fail. The ALJ provided a thorough and complete review of Howell's extensive medical record, couched in 20 C.F.R. § 404.1520c's required terms of "supportability" and "consistency." The ALJ did not look only to the records where Howell's conditions improved, and neither was he required to look only to periods of decompensation for purposes of his decision. I find no error in the ALJ's consideration of CNP Binkley's medical opinions.

I therefore recommend the District Court affirm the final decision of the Commissioner.

**VII.    Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Howell's application for DIB be affirmed.

Dated: April 24, 2026

Reuben J. Sheperd
United States Magistrate Judge

---

**OBJECTIONS**

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections

40

may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).

under